IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                          Case No. 8:11-bk-22258-MGW
                                                                Chapter 7
Fundamental Long Term Care, Inc.,

                    Debtor.

_____/

Fundamental Long Term Care Holdings, LLC;          Adv. Pro. No. _____
Fundamental Administrative Services, LLC;
Murray Forman; Leonard Grunstein; Fundamental
Clinical Consulting, LLC; THI of Baltimore, Inc.,

                    Plaintiffs,
v.

Fundamental Long Term Care, Inc.; Trans Health
Management, Inc.; Beth Ann Scharrer, Trustee;
 Estate of Juanita Jackson; Estate of Arlene
Townsend; Estate of Elvira Nunziata; Estate
of James Jones; Estate of Opal Lee Sasser; Estate
of Joseph Webb; Estate of Darson;
Alan Grochal, Receiver for Trans Healthcare, Inc.

                    Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs Fundamental Long Term Care Holdings, LLC ("FLTCH"), Fundamental

Administrative Services, LLC ("FAS"), Murray Forman ("Forman"), Leonard Grunstein

("Grunstein"), Fundamental Clinical Consulting, LLC ("FCC"), and THI of Baltimore, Inc.

("THIB"), pursuant to 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. § 105, Rule 7065 of the Federal

Rules of Bankruptcy Procedure, and this Court's Memorandum Opinion on Proper Forum for

Fraudulent Transfer and Alter Ego Claims entered on September 12, 2013, Dkt. 65, in Adversary

Proceeding No. 8:12-ap-01198 styled as *Beth Ann Scharrer, Chapter 7 Trustee v. Zack et al.* (the

"Memorandum Opinion"), hereby file their Complaint for Injunctive and Declaratory Relief

against Defendants Fundamental Long Term Care, Inc. ("FLTCI"), Trans Health Management,

Inc. ("THMI"), Beth Ann Scharrer, solely in her capacity as chapter 7 Trustee for FLTCI (the

"Trustee"), Estate of Juanita Jackson ("Jackson"), Estate of Arlene Townsend ("Townsend"),

Estate of Elvira Nunziata ("Nunziata"), Estate of James Jones ("Jones"), Estate of Opal Lee

Sasser ("Sasser"), Estate of Joseph Webb ("Webb"), Estate of Darson ("Darson"), and Alan

Grochal, Receiver for Trans Healthcare, Inc. (the "Receiver") and allege as follows:

<u>**General Allegations**</u>

      A.    <u>Parties</u>

1.    Plaintiff FLTCH is a Delaware limited liability company with its place of

business in Sparks, Maryland.  Its sole members are Plaintiff Forman, a resident of New York,

and Plaintiff Grunstein, a resident of New Jersey.

2.    Plaintiff FAS is a Delaware limited liability company with its place of business in

Sparks, Maryland, whose sole member is FLTCH.

3.    Plaintiff Forman is a resident of New York and a member of Plaintiff FLTCH.

4.    Plaintiff Grunstein is a resident of New Jersey and a member of Plaintiff FLTCH.

5.    Plaintiff FCC is a Delaware limited liability company with its place of business in

Sparks, Maryland, whose sole member is Plaintiff THIB.

6.    Plaintiff THIB is a Delaware corporation with its place of business in Sparks,

Maryland.

7.    Defendant FLTCI is a Delaware corporation and chapter 7 debtor in this

bankruptcy proceeding.

8.    Defendant THMI is a Delaware corporation and a non-debtor subsidiary of

FLTCI.

9.      Defendant Trustee is a Florida resident and the chapter 7 trustee for FLTCI in this bankruptcy proceeding.

10.      Defendant Jackson is the probate estate of Juanita Jackson, deceased, in the case of In re: The Estate of Juanita Jackson, pending in the Circuit Court for Polk County, Florida. Jackson has filed a proof of claim in this bankruptcy case.

11.      Defendant Nunziata is the probate estate of Elvira Nunziata, deceased, in the case of In re: The Estate of Elvira Nunziata, pending in the Circuit Court for Pinellas County, Florida. Nunziata has filed a proof of claim in this bankruptcy case.

12.      Defendant Webb is the probate estate of Joseph Webb, deceased, in the case of In re: The Estate of Joseph Webb, pending in the Circuit Court for Alachua County, Florida.  Webb has filed a proof of claim in this bankruptcy case.

13.      Defendant Townsend is the probate estate of Arlene Townsend, deceased, in the case of In re: The Estate of Arlene Townsend, pending in the Circuit Court for Polk County, Florida.  Townsend has filed a proof of claim in this bankruptcy case.

14.      Defendant Sasser is the probate estate of Juanita Jackson, deceased, in the case of In re: The Estate of Opal Lee Sasser, pending in the Circuit Court for Polk County, Florida. Sasser has filed a proof of claim in this bankruptcy case.

15.      Defendant Jones is the probate estate of James Jones, deceased, in the case of In re: The Estate of James Jones, pending in Montgomery County, Pennsylvania.  Jones has filed a proof of claim in this bankruptcy case.

16.      Defendant Darson is probate estate of Alice Elizabeth Green Darson, deceased, in the case of In re: The Estate of Darson, pending in the Probate Court for Berkley County, South Carolina.  Darson has filed a proof of claim in this bankruptcy case.

17.     Defendant Receiver is the receiver for the estate of Trans Healthcare, Inc. and its subsidiaries, appointed by the Circuit Court for Baltimore County, Maryland in the case styled *In the Matter of the Receivership Estate of Trans Healthcare, Inc., et al*, Case No. 03-C-09-000141.

B.      Jurisdiction and Venue

18.     This action is an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure and is brought pursuant to 28 U.S.C. §§ 2201 and 2202 and 11 U.S.C. § 105.

19.     This action is a civil proceeding arising in or related to a case under title 11 of the United States Code and a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (H) and (O). This Court therefore has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334(b) and this Court's Memorandum Opinion.

20.     Venue of this action in this District is proper under 28 U.S.C. § 1409(a).

C.      Summary of Adversary Proceeding

21.     For several years, the law firm of Wilkes & McHugh ("Wilkes," or the "Wilkes firm"), which represents Defendants Jackson, Nunziata, Webb, Townsend, Sasser and Jones (the "Defendant Estates"), have accused Plaintiffs and others in multiple forums, including this Court, of orchestrating a scheme to defraud the Defendant Estates, in their capacity as tort claimants and judgment creditors of Defendant THMI and its former parent company, Trans Healthcare, Inc. ("THI").

22.     The Defendant Estates' accusations have included claims that the Plaintiffs stripped THI and THMI of valuable assets allegedly worth in excess of $1 billion, through stock sale transactions that closed in March 2006, nearly eight years ago.

23.     More recently, the Trustee and her counsel, on behalf of the bankruptcy estate of Defendant FLTCI and FLTCI's non-debtor subsidiary, Defendant THMI, have joined these

accusations and have aided and abetted the Defendant Estates in pursuing these claims in various

state courts, while concurrently arguing to this Court that these claims are solely property of this

chapter 7 estate.

24.     This Court has ruled that all of the claims and causes of action that are the subject

of these and other similar accusations against Plaintiffs and others affect the administration of the

FLTCI chapter 7 estate and should be litigated in a single adversary proceeding before this

Court.

25.     Plaintiffs therefore bring this action: (a) to enjoin any further prosecution of such

claims and causes of action by the Defendant Estates against Plaintiffs and other "targets" in

other courts; and (b) to obtain declarations (i) that the Plaintiffs did not receive any actual or

constructive fraudulent transfers from FLTCI, THMI or THI, (ii) that the Plaintiffs have no

liability to FLTCI, THMI, THI or the Defendant Estates under theories of alter ego, corporate

veil piercing, or successor liability, (iii) that the Plaintiffs did not, by act or omission, commit

any fraud or act with any fraudulent intent against the Defendant Estates, (iv) that none of the

Defendants have been damaged by any conduct of the Plaintiffs, and (v) that all applicable

statutes of limitations with respect to the foregoing causes of action as against the Plaintiffs have

lapsed.

**Statement of Facts**

A.     History of Trans Healthcare, Inc. and THI of Baltimore, Inc.

26.     THI was formed in 1998 by Anthony Misitano for the purpose of acquiring long

term care, skilled nursing and similar operations through wholly-owned subsidiaries.  THI was

originally capitalized in part through equity investments by private equity funds affiliated with

GTCR Golder Rauner, LLC (collectively, "GTCR").

27.     THI was headquartered in Camp Hill, Pennsylvania.

28.     THI had operating subsidiaries with operations located in Pennsylvania, Ohio and Maryland.

29.     THMI was formed in 2002 as a wholly-owned subsidiary of THI for the purposes of performing centralized management and administrative services for THI's operating subsidiaries.

30.     The establishment of a single, separate management entity to perform centralized management and administrative services for a family of nursing home companies is standard practice in the long term care industry.

31.     Additionally, on or around June 1, 2002, THMI entered into management services agreements with an unaffiliated family of companies owned by Lyric Health Care and Claremont Health Care (collectively, "Lyric") to provide administrative and operational support services to these entities.

32.     Unlike the management services THMI provided to THI's operating subsidiaries, upon information and belief, THMI's services to Lyric did not include ultimate control over the facility budgets, which, in turn, impacts facility staffing levels.  Approval of facility expenditures was retained by Lyric.

33.     THMI never held any licenses to operate long term care facilities and never provided or employed people who provided hands-on clinical care.

34.     THMI's management agreements provided for a management fee in the range of 3% to 4% of gross revenue on a facility-by-facility basis.  This fee structure is and/or was standard for services provided by similar management entities in the long term care industry at that time.

35.     At no time in THMI's operational history did its gross fee revenue exceed its operating expenses.

36.     From 2002 until termination of operations in March 2006, THMI maintained negative earnings before interest, taxes, depreciation and amortization (EBITDA).

37.     The relative break-even nature of THMI's financial performance while in operation is common for affiliated management companies in the long term care industry.

38.     Contrary to allegations made by Wilkes, as counsel to the Defendant Estates in other courts, management contracts and arrangements such as those formerly held by THMI are not the valuable assets of a long term care enterprise.  Rather, the revenue stream generated by the actual licensed operators from actual patient care (from insurance, government payors or private payors) constitutes the primary value of such companies (in addition to rights, title and interest in any tangible assets).

39.     THMI never owned any material amount of tangible assets, nor did it "own" any revenues from patient care. THMI never provided patient care and had no licenses to do so.

40.     In 2002, THI submitted a bid at auction for certain of assets owned by Integrated Health Services, Inc. ("IHS"), which, along with its subsidiaries, were debtors and debtors-in-possession in a jointly administered chapter 11 case (no. 00-00389) pending in the U.S. Bankruptcy Court for the District of Delaware.  Such assets consisted of the operations of approximately 120 long term care and skilled nursing facilities, therapy companies and related real estate.

41.     At the time of the THI bid, IHS was headquartered in several buildings in an office park campus in Sparks, Maryland.

42.     THI was outbid at the IHS auction by Abe Briarwood, Inc. ("Briarwood"), an entity founded and owned by a third party real estate developer named Uri Kaufman who obtained his financing from another developer named Rubin Schron.

43.     Plaintiff Grunstein did legal work on certain aspects of the transaction for Schron. Plaintiff Forman served as a financial advisor to Briarwood.

44.     Briarwood became the successful bidder for the IHS assets, specifically, the stock of IHS Long Term Care, Inc. and IHS Therapy Care, Inc., including the related facility real estate.

45.     After Briarwood was declared the successful bidder for the IHS assets, THI filed a lawsuit against Briarwood in the Delaware Bankruptcy Court with respect to the bidding process.

46.     To settle this lawsuit, Briarwood, which was not an operator of long term care or skilled nursing facilities, approached THI to propose that THI and its affiliates assume the operations of the former IHS facilities.  The proposal included both sub-lease and lease arrangements.

47.     Under Briarwood's proposal to THI, the real estate that was owned by the former IHS subsidiaries would be conveyed to entities ultimately owned by Schron (collectively, the "CAM entities"), which would enter into direct leases with newly-created operating subsidiaries affiliated with THI.  The former IHS operating subsidiaries (that would then be owned by Briarwood) that retained lease agreements with the landlords of facilities they operated would enter into sublease agreements with additional newly created operating subsidiaries affiliated with THI.

48.     In order to effectuate the acquisition of the operations of the former IHS facilities, THI was restructured as follows:  GTCR contributed its equity interest in THI to a newly-formed

holding company called THI Holdings, LLC ("THIH"), which, in turn, was substantially owned and controlled by GTCR.

49.     Additionally, Plaintiff THIB was formed as a new, wholly-owned subsidiary of THIH, and thus, a sister company of THI.

50.     THIB, in turn, formed a number of direct and indirect subsidiaries to enter into the leases and sub-leases and to effectuate the transfer of the operations of the former IHS facilities.

51.     THI and its subsidiaries from its earlier operations, on one hand, and THIB and its subsidiaries on the other hand, were separately financed.  THI had a credit facility with GE Capital Corporation and THIB entered into a credit facility with Capital Source.  THI and THIB also had completely separate cash management structures.

52.     During the period of restructuring, THIB also formed a directly owned limited liability company called THI of Baltimore Management, LLC ("THIBM"), for the purpose of entering into contracts with its newly formed operating subsidiaries to perform centralized management and administrative services that had previously been performed for the former IHS facilities by employees of Integrated Health Services, Inc.  The management agreements between THIBM and the new THIB operating subsidiaries were entered into in August 2003.  It was contemplated that the former IHS employees providing management services would become employees of THIBM upon the close of the transaction.

53.     In May 2003, the Joint Plan of Reorganization for IHS was confirmed by the U.S. Bankruptcy Court for the District of Delaware.  The Plan that was presented to the Court included both the stock purchase by Briarwood and the accompanying arrangements with THIB and its subsidiaries.

54.     The Briarwood stock purchase closed on or about August 29, 2003 and the operations of most of the former IHS operating subsidiaries were transferred to the newly formed operating subsidiaries indirectly owned by THIB in early September 2003.

55.     IHS employees who were being hired to provide services to the newly formed operating subsidiaries indirectly owned by THIB moved from an office building at 910 Ridgebrook to offices located at 930 Ridgebrook Road , both which were part of the former campus of buildings where IHS had operated.  Neither Briarwood, nor THI, THIB or THIH acquired the real estate associated with the former IHS headquarters.

56.     While it was originally contemplated that the former IHS employees would become employees of THIBM, for convenience and expediency, most of them were hired by and placed on the payroll of THI's existing management company, THMI.

57.     THMI, however, did not have contracts to service THIB subsidiary facilities, as such contracts belonged to THIBM. THMI personnel nonetheless performed THIBM's management function under these contracts through an unwritten arrangement with THIBM, and collected the management fees for its own account to apply against THMI's costs of providing such services.

58.     By September 2003, THMI was performing management and administrative services for all of the THI subsidiary operations, and was providing administrative and operational support services to at least 30 Lyric facilities and approximately 120 THIB facilities. It had over 300 employees, many of them located in Sparks, Maryland, as a result of the Briarwood acquisition of IHS Long Term Care, Inc., the THI/Briarwood settlement agreement, and related lease and sublease arrangements with THIB subsidiaries.

59.     At no time were any of the Plaintiffs ever an insider (as defined in the Bankruptcy Code) of GTCR or THIH or an investor in GTCR or any of their business ventures.

60.     At no time were any of the Plaintiffs direct or indirect shareholders, directors, officers or employees of THI or any of its subsidiaries.

61.     At no time did any of the Plaintiffs, including THIB, ever assert or exercise any control over THI or its subsidiaries.

62.     At no time did any of the Plaintiffs have a confidential or fiduciary relationship with any of GTCR, THIH, THI, THMI, or any of THI's other subsidiaries.

B.      THI and THIB Distress and Defaults

63.      In May 2004, THIH's auditors completed their audit of THIH financial statements for fiscal year ended December 31, 2003.  This audit disclosed material misstatements in the THI 2003 financial statements that resulted in a significant decline in confidence in and the profitability of the THIH and its subsidiaries.

64.     The audit demonstrated that THI and its subsidiaries were not profitable in either fiscal year 2002 or 2003.  This became evident between May 2004 and the end of 2005, when the entities' consolidated gross revenues and the number of facilities declined by almost 50%.  THI ultimately fell into default on its credit facility with GE Capital Corporation.

65.     In October 2004, Lyric terminated the management contracts between THMI and the facilities where relatives of the Defendant Estates received care.  THMI ceased providing services to all Lyric facilities on or before May 1, 2005.

66.     By mid-2004, THI and its subsidiaries began to evaluate their options for the restructuring of their debt, including the filing of petitions for relief under chapter 11.

67.     Unlike THI and its subsidiaries, THIB remained profitable after the restatement of the 2003 financial statements as the misstatements only impacted THI and its subsidiaries.

68.     Having heard about THIH's precarious financial situation, in January 2005, Plaintiff Forman, acting in his personal capacity, met with Brad Bennett, then an officer of THIH and THIB, to discuss whether there was any interest in selling THIB.

69.     These discussions led to negotiations by Plaintiff Forman with THIH for the sale of some or all of THIB's business to himself and Plaintiff Grunstein.

C.     2006 Stock Purchase Transactions

70.      As a result of these negotiations among Forman, THIB and THIH, the parties agreed to a sale of the stock of THIB from its sole shareholder, THIH, to a new entity to be formed by Forman and Grunstein.

71.     THIH was determined to retain its interest in THI and to try to return it to profitability.

72.     In December 2005, Plaintiffs Forman and Grunstein formed Plaintiff FLTCH to serve as the acquisition vehicle for the stock of THIB.

73.     As of the end of 2005, THIB indirectly owned subsidiaries that held the licenses to operate approximately 125 facilities and THI indirectly owned approximately 25 operating subsidiaries.  Upon information and belief, neither THIB nor THI directly or indirectly owned the real estate associated with their respective operating companies.  As Lyric had terminated THMI as a management service provider by May 2005, this left THMI with no management contracts and approximately 150 facilities under informal management arrangements, over 80% of which were THIB subsidiaries.

74.     Notably, THMI never had a contractual or other legal right to collect a management fee from THIB's subsidiaries.  Regardless, between September 2003 and the March 2006 stock purchase transactions, THMI collected a management fee from THIB subsidiaries to

apply against its costs and structural overhead as the management company actually providing the administrative services.

75.     Despite collecting these fees, THMI was never a profitable enterprise.

76.     The sale of THIB to FLTCH meant that THMI's operations would be substantially diminished and THMI would be losing the majority of its fee base.

77.     THMI required a certain level of fee revenue in order to support its large management and administrative staff.  With the loss of the THIB facility management fees, THMI could not support its operations.

78.     Moreover, it was not feasible for THMI to replace this revenue with outside management service contracts (including any such contracts with THIB facilities post-sale). Such contracts are generally terminable at will under market terms, which would leave THMI exposed to the risk of a sudden loss of large blocks of revenue from changes in any relationship with third-party operators, with a resulting inability to support the infrastructure it would need to maintain to service such contracts in the first place.  Thus, keeping THMI as an operating management company solely for the THI facilities was not a viable option.

79.     During the course of the negotiation of the sale of THIB's stock to FLTCH, THIH offered to include the stock of THMI in the sale.

80.     FLTCH declined to purchase THMI, as (a) it was not a subsidiary of THIB, the only entity FLTCH was buying, and (b) the THIB facilities already had a management subsidiary that held management contracts with the THIB operating subsidiaries, i.e. THIBM.

81.     THMI's board therefore resolved to terminate operations as of the sale of THIB.

82.     Prior to the sale of THIB, some but not all employees of THMI were hired by THIBM in anticipation of the closing.  Upon information and belief, many or most of the

remaining THMI employees remained in the THI family of companies to help provide management or other administrative services to THI's remaining operations.

83.     Although FLTCH declined to purchase THMI, Plaintiff Forman learned that THMI had certain tangible assets in the form of computer hardware.  Forman inquired of his counsel at Troutman Sanders whether they were aware of a party who might be interested in purchasing THMI.  Forman learned that there was an existing Troutman client, Barry Saacks, who had previously been involved with small deals related to larger transactions.

84.     At the time, Forman's only knowledge of Saacks was that he was an elderly ultra Orthodox British gentleman who had fallen on hard times.  He further understood that other Troutman clients had provided business opportunities to Saacks as *tzedakah*, or a charitable act.

85.     Mr. Saacks was contacted by Troutman Sanders and agreed to acquire the stock of THMI.  Troutman Sanders incorporated FLTCI as the acquisition vehicle for the stock of THMI.  Mr. Saacks was, and remains, the sole shareholder of FLTCI.

86.     Troutman Sanders prepared articles of incorporation for FLTCH and articles of incorporation for FLTCI and filed them concurrently in December 2005.

87.     Troutman Sanders negotiated stock purchase agreements separately on behalf of both FLTCI and FLTCH.  These agreements were executed on February 28, 2006.

88.     The sales of the stock of THIB and THMI closed concurrently on March 28, 2006.  FLTCH acquired the THIB stock for the sum of $9.9 million, and FLTCI acquired the stock of THMI for $100,000.

89.     Both transactions were financed as a leveraged buyout whereby THIB drew down on its line of credit with Capital Source to provide funding for the purchases.  The $100,000.00

loan to FLTCI was intended to be repaid through THIBM's lease of the computer hardware and software owned by THMI.

90.     Valuation professionals of Duff & Phelps issued a fairness opinion in connection with FLTCH's acquisition of the THIB stock.

91.     At all times up to and including the closing of the sale of the THIB stock to FLTCH, none of the Plaintiffs were insiders (as that term is defined in the Bankruptcy Code) of GTCR, THIH or any of their subsidiaries or affiliates, and none of them were on confidential or fiduciary terms with GTCR, THIH or any of their subsidiaries or affiliates.

92.     All aspects of the negotiation and closing of the transaction were at all times arms' length.

93.     At the time of the transactions, Plaintiff Forman was not aware of any specific litigation against THMI but was aware of three categories of potential claims and reasonably believed that all claims would be defended and indemnified by solvent parties.

94.     Among other things, the Stock Purchase Agreement between FLTCH and THIH relating to the stock of THIB (the "THIB SPA") provided that THIB and its subsidiaries would indemnify THIH and its affiliates, including THMI, with respect to any management services provided by THMI to facilities indirectly owned by THIB up to the closing date.

95.     Additionally, the Stock Purchase Agreement between FLTCI and THI relating to the stock of THMI (the "THMI SPA") provided that THIH and THI would indemnify THMI with respect to any management services provided by THMI to facilities indirectly owned by THI up to the closing date.  Plaintiffs Forman and FLTCH understood that with GTCR's financial support, THIH and THI would be able to fulfill their indemnity obligations to THMI.

96.     There was a third category of potential cases, involving Lyric facilities to which THMI had previously provided administrative and operational support services.  Forman and FLTCH understood that Lyric owed an indemnity obligation to THMI for services THMI provided to Lyric facilities, that Lyric was a solvent entity and that, ultimately, a company that is not providing hands-on care cannot, as a matter of law, be held responsible for providing negligent care.

97.     Unbeknownst to FLTCH and Forman, Lyric had sued THI, THMI, and others prior to the closing of the stock sales, and had entered into a Settlement Agreement, dated February 24, 2006, just four days before the execution of the THMI SPA and the THIB SPA. Pursuant to this settlement agreement, THMI waived this indemnity obligation.

98.     The Stock Purchase Agreements were not amended to reflect the settlement agreement with Lyric, and Forman and FLTCH, had no knowledge of THMI's release of its rights of indemnification against Lyric.

99.     Despite the release of Lyric from its indemnity obligations, GTCR, THIH and THI reasonably believed they had provided for the indemnification of THMI for all categories of litigation claims against it through existing language in the stock purchase agreements, and continued to provide a defense to THMI in cases against Lyric facilities where THMI was also sued.

100.    It was therefore the intention of all parties to these stock purchase transactions, including plaintiffs Forman, FLTCH and THIB, that THMI would be defended and indemnified with respect to all pending litigation, noticed claims, and incurred but not reported claims against THMI arising through the closing date.

101.    The parties did not intend to leave THMI saddled with any undefended tort liability relating to its management service operations.

102.    Mr. Saacks was 70 years old at the time of the sale of the THMI stock, but in apparent good physical and mental health.  Shortly after the closing, his health began to deteriorate with multiple falls and episodes where he did not recall falling.  Given his physical and mental infirmities, he did not do anything with the THMI computer hardware and software assets, nor did he do anything to maintain the charters of either FLTCI or THMI.  He has since entered into a nursing home himself.

103.    Concurrently with the closing of the stock sales, on information and belief, GTCR invested an additional $20 million of equity capital into THI in an attempt to grow the business and return it to profitability, which was ultimately unsuccessful.  THI and its affiliates continued to operate at a loss for several years.  The bulk of their facilities were sold off in 2008.

104.    In January 2009, THI and its then 43 subsidiaries filed a voluntary receivership proceeding in the Circuit Court for Baltimore County, Maryland.

105.    Upon the commencement of the THI receivership, all claims and causes of action relating to, among other things, avoidance of fraudulent transfers, veil piercing or alter ego liability, and successor liability, vested exclusively in the court-appointed receiver.

D.    THMI Litigation

106.    While in operation, THMI did not hold any licenses to operate long term care facilities and did not provide or employ people who provided hands-on clinical care.

107.    THMI  provided back office support services, such as accounting, in-house legal, reimbursement, payroll processing and human resources support from its remote location first in Camp Hill, Pennsylvania, and later,  in Sparks, Maryland, as well as operational support services, such as mock surveys and clinical scorecards.  It never, however, provided hands-on care.

108.    Management and operational and administrative support companies, such as THMI, are invariably indemnified by the licensed operators to which they provide services for professional and general liability ("PLGL") claims brought by facility residents.

109.    Service providers like THMI are often joined as defendants in PLGL cases by Wilkes, but absent control over budgeting and staffing, are almost never found independently liable because they are not involved in or in any way responsible for hands-on patient care. Generally, when properly represented, either (a) the claims against them are defeated, or (b) they enter into global settlements that include, and are funded by, the licensed operator defendants.

110.    THMI had rights of indemnification from THI with respect to THI subsidiary facilities and from THIB with respect to THIB subsidiary facilities, which indemnification rights continue to this day.

111.    While THMI was under contract with Lyric, it likewise had rights of indemnification from Lyric with respect to services provided for Lyric facilities.

112.    Throughout its operations as a management company, which lasted from 2002 until 2006, THMI was joined as a defendant in hundreds of PLGL lawsuits filed by patients of facilities, some of which have been represented by Wilkes, for which it had performed (or may have performed) management services.

113.    On July 30, 2004, Jackson, represented by Wilkes, filed a lawsuit against the licensed operator of Auburndale Oaks, a skilled nursing facility operated by Lyric.  This action included THI and THMI as defendants even though THI is a holding company and never provided any services to the facility THMI had performed services for Auburndale Oaks from 2002 until the termination of THMI's contract with Lyric in October 2004.

114.    On December 23, 2005, Nunziata, represented by Wilkes, filed a lawsuit against the licensed operator of Pinellas Park, a skilled nursing facility operated by Lyric.  This action included THMI as a defendant.  THMI had performed services for Pinellas Park from 2002 until Lyric's transfer of this facility in March 2004.  Ms. Nunziata was a resident of Pinellas Park until on or around October 12, 2004, the day she died as a result of a stair fall (seven months after THMI ceased providing services for this facility).

115.    On June 16, 2006, Webb, represented by Wilkes, filed a lawsuit against the licensed operator of University Place Care & Rehab Center, a skilled nursing facility operated by Lyric.  This action included THI and THMI as defendants, even though THI is a holding company and never provided any services to the facility.  THMI had performed services for this facility from 2002 until the termination of THMI's contract with Lyric in October 2004.

116.    On September 6, 2006, Sasser, represented by Wilkes, filed a lawsuit against the licensed operator of Auburndale Oaks, a skilled nursing facility operated by Lyric.  This action included THI and THMI as defendants even though THI is a holding company, and never provided any services to the facility.  THMI had performed services for Auburndale Oaks from 2002 until the termination of THMI's contract with Lyric in October 2004.

117.    On March 20, 2006, Jones, represented by Wilkes, filed a lawsuit against the licensed operator of Andorra Woods Healthcare Center, a skilled nursing facility owned and operated by Lyric.  This action included THMI and THI as defendants even though THI is a holding company and never provided any services to the facility.  THMI had performed services for this facility from 2002 until the termination of THMI's contract with Lyric in October 2004.

118.    On January 29, 2009, Townsend, represented by Wilkes filed a lawsuit against the licensed operator of Auburndale Oaks, a skilled nursing facility operated by Lyric.  This action

included THMI and THI even though THI is a holding company and never provided any services to the facility. THMI had performed services for Auburndale Oaks from 2002 until the termination of THMI's contract with Lyric in October 2004. Ms. Townsend was a resident of Auburndale Oaks until September 2007, when she died from a broken hip suffered in August 2007 (almost three years after THMI's termination by Lyric as management service provider to this facility).

119.    The timing of the termination of THMI's contracts with the respective Lyric facilities with respect to certain of the Defendant Estates was as follows: (a) seven months before the injury that killed Ms. Nunziata; (b) prior to the partial amputation suffered by Mr. Webb and eleven months before he ceased being a resident at the subject facility; (c) three years prior to Ms. Townsend's death (in 2007); (d) ten months before Mr. Sasser ceased being a resident; and (e) nearly two years before Mr. Jones ceased being a resident.

120.    With respect to the Nunziata matter, not even Lyric (as the licensed operator of the facility, i.e. the entity responsible for providing hands-on care and ensuring the safety of the resident) was still involved in the subject facility at the time of Ms. Nunziata's fatal accident; it had ceased being the licensed operator in lieu of a new, completely unrelated party, who was the operator of the facility at the time Ms. Nunziata had her fatal fall. THMI never had a contract with the new operator or provided any services to the new operator.

121.    At the time of the closing of the stock sales, none of the Plaintiffs were aware, or reasonably could have or should have been aware, of the existence of any legitimate actions against THI or THMI or the injuries allegedly suffered by any of them (indeed, only three of their lawsuits had even been filed, one of them eight days prior to closing)

122.     According to Schedule 5H, "General Claims and Litigation – Trans Health Management" (the "Litigation Schedule"), attached to the THMI SPA, at the time of FLTCI's purchase of the THMI stock, there were 135 pending or threatened actions against THMI.

123.     None of the Plaintiffs participated in the preparation of the Litigation Schedule.

124.     Only two of the actions or claims on the Litigation Schedule were claims of the Defendant Estates – i.e., Jackson and Webb.

125.     Though the Nunziata action had been filed in December 2005, it was not on the Litigation Schedule.

126.     Jones, through Wilkes, filed its action the month of the closing of the stock sale. Sasser and Jones filed their actions several months after the closing, and Townsend filed almost three years after the closing (Ms. Townsend lived for 17 months after the closing and died from a single incident in September 2007).

127.     In each of these actions, other than the case brought by Jones, the Defendant Estates, through Wilkes, have settled with the Lyric operators and their affiliates, leaving only THMI and THI as defendants (with one exception, the case brought by Nunziata, in which THMI is the only remaining defendant).

128.     Of the settlements the Plaintiffs are aware of, Webb settled with all other defendants (including the licensed operators responsible for patient care) for the sum of $575,000 and Nunziata settled with all other defendants (including the licensed operators responsible for patient care, which at the time of the accident was not even Lyric) for the sum of $1,500,000.

129.     Under circumstances of which this Court is aware:  (a) in July 2010 Jackson obtained a default judgment against THMI for $55 million and against THI for $55 million; (b) in January 2012, Nunziata obtained a $200 million default judgment against THMI alone; (c) in

February 2012, Webb obtained a joint and several default judgment against THMI and THI for $900 million; and (d) in July 2013, Townsend obtained a jury verdict, after entry of default, against THI in the amount of $1.1 billion.  The claims of Sasser and Jones have not been adjudicated.  Both assert a claim against the debtor FLTCI in the amount of $200 million.

130.    All of these awards are virtually without precedent in the long term care industry in general, and completely without precedent as against an outside service provider with no license to provide patient care, no ability to control the budget and staffing at the defendant facilities, and, in the case of THI, a holding company, which had no contractual or other relationship with the subject health care facility.  The Webb and Townsend judgments are two of the largest tort verdicts in Florida history.

131.    In Plaintiffs' experience with the mediation and settlement of PLGL matters against long term care facilities: (a) licensed operators (i.e., the entities actually responsible for patient care) generally settle negligence claims, including wrongful death claims related to general neglect, bed sores/pressure ulcers, slip and falls etc., in a range of anywhere from low five figures, including $10,000.00 or less (*de minimis* cost of defense value) to low seven figures on the highest end; and (b) licensed operators generally only settle in excess of $1 million in cases of intentional or reckless wrongdoing by the facility operator.

132.    At the time of the closing of the stock sales in March 2006, none of the Plaintiffs were aware of or reasonably could have or should have been aware of any pending legitimate claims asserted by the Defendant Estates against THMI or THI (indeed, no assets were purchased from THI or THMI by any of the Plaintiffs).

133.    At the time of the closing of the stock sales, none of the Plaintiffs were aware or reasonably could have or should have been aware that any claim against THMI would not receive the benefit of defense and indemnification.

134.    At no time relevant to these proceedings have the Plaintiffs been aware of or reasonably could have or should have been aware of any circumstances that would justify adjudication of the claims of the Defendant Estates (or any other party) against THMI or THI (which had no contractual or other relationship to the licensed health care provider in each instance), in amounts that are so radically, indeed exponentially, higher than typical claims against outside management companies like THMI or holding companies not involved in operations like THI.  Plaintiffs continue to believe that no such circumstances ever existed.

135.    As such, at no time prior to the entry of these judgments starting in 2010, more than four years after the closing of the two stock sales, could any of the Plaintiffs have reasonably anticipated that THMI, as an outside administrative and operational support services provider, or THI, as THMI's holding company that wasn't involved in operations, could possibly have any material unindemnified liabilities, to the Defendant Estates.

136.    Upon information and belief, all of the Defendant Estates, through their counsel Wilkes, became aware of the March 2006 sales of the THIB and THMI stock no later than January 1, 2007.  The Plaintiffs did not conceal these sales in any way, from the Defendant Estates or any other party.

E.      Relevant Post-Closing History

137.    Immediately prior to the closing of the stock sales, most (but not all) of THMI's personnel were retained by THIBM and placed on its payroll.  These personnel included, for the most part, the former IHS employees who were intended to be placed on THIBM payroll at the close of the Briarwood Stock Purchase Agreement in 2003.

138.    Concurrently, THI organized a new management entity called PathCARE, Inc. PathCARE's function was to arrange for outside management services for the approximately 25 THI subsidiary facilities, after the termination of THMI's services.

139.    Concurrently with the closing, THIBM entered into an Administrative Services Agreement (the "ASA") with PathCARE to provide management and administrative services to the remaining THI facilities, including in-house legal and litigation support services.

140.    THI continued to provide for the defense of THMI in pending actions against it, other than those relating to THIB subsidiary facilities.  THI-defended actions included the lawsuits filed by the Defendant Estates, even though these actions were not subject to THI's indemnification obligations, as they related to Lyric facilities, not THI facilities.

141.    From March 2006 until September 2006, THIBM provided contractual litigation support services for THI's defense of actions against it, its subsidiaries, and THMI.  Such services included identifying and retaining defense counsel, serving as a liaison between PathCARE and defense counsel, and pursuing insurance coverage.

142.    In September 2006, Plaintiff FCC (f/k/a THIBM) restructured the management of the THIB subsidiaries' facilities to de-centralize management and administrative services and increase the autonomy of the facilities.

143.    In connection with this restructuring, Plaintiffs FCC (f/k/a/ THIBM) and FLTCH formed Plaintiff FAS to assume this administrative services function for entities indirectly owned by THIB that held the licenses to operate health care facilities and companies.  THIBM management personnel performing administrative tasks, such as accounting, in-house legal, reimbursement and payroll support services were hired by FAS as administrative consultants. The business of FAS is materially different than the business of THIBM as conducted prior to

September 2006 and is focused primarily on consulting with health care providers and their respective parent companies.

144.   Upon its formation in September 2006, FAS, through contract modification and with PathCARE's consent, assumed the ASA with PathCARE and continued to provide, among other things, legal support services for the defense of THI, its subsidiaries, and its former subsidiary THMI.  THIBM was re-named as Plaintiff FCC, and its function changed to provide clinical and operational support services to companies indirectly owned by THIB.

145.   In January 2009, THI and its remaining subsidiaries filed the receivership proceedings in Baltimore, Maryland state court.  The THI Receiver assumed PathCARE's ASA with FAS, and FAS continued to provide, among other things, legal support services, now to the THI receiver, in connection with the defense of remaining actions against THI, its subsidiaries, and THMI, including the actions by the Defendant Estates.

146.   Under circumstances with which this Court is familiar, the THI Receiver withdrew his defense of the Defendant Estates' actions against THI and its former subsidiary THMI in April 2010, more than four years after the closing of the two stock sales and solely with regard to those health care facilities which had been owned, operated or controlled by Lyric.   On information and belief, no defenses of THMI in any other action were terminated by the THI Receiver, any of the Plaintiffs, or any other third party.

147.   The Defendant Estates continued to prosecute their actions, resulting in the default judgments described above.

148.   THIBM, and later FAS, through its contractual arrangements with FLTCH and its subsidiaries, acted as in-house counsel for FLTCH and its direct and indirect operating subsidiaries that were sued.

149.     In those lawsuits related to injuries alleged at FLTCH/THIB facilities in which THMI was named as well, THMI was defended pursuant to the terms of both the Stock Purchase Agreement and Termination and Assumption Agreements between THMI and the operating subsidiary facilities.

150.     No actions against FLTCH/THIB subsidiaries in which THMI was also a named defendant went undefended or resulted in any defaults.  All such actions have now been litigated either to settlement, dismissal or defense verdict at no cost to THMI.

151.     Of the 135 claimants listed on the Litigation Schedule to the THMI SPA, only two – Jackson and Webb – obtained default judgments against THMI, asserted any creditors' rights claims against Plaintiffs, or even made an appearance in this chapter 7 case.

152.     On information and belief, none of the other 133 claimants remain a claimant against or creditor of THMI.

153.     On information and belief, THMI has not used any of its own assets to satisfy any of these 133 claims.

154.     Jackson, Webb, and the other four Defendant Estates have two key things in common:  (a) their decedents were residents of Lyric facilities, not THI or THIB facilities; and (b) they are all represented by the Wilkes firm.

F.     Relevant Bankruptcy and Receivership History

155.     In July 2010, Jackson, through Wilkes, obtained default judgments against THI and THMI in the amount of $55 million each.

156.     After obtaining these judgments, Jackson sought collection of these judgments from third parties, including the Plaintiffs (other than FCC) and FLTCI, through proceedings supplementary to judgment under Section 56.29 of the Florida Statutes.

157.     FLTCI did not receive proper notice of the proceedings against it, and in September 2011, the Polk County, Florida Circuit Court entered an amended judgment in Jackson's action adding FLTCI as a party personally liable, jointly and severally with THI and THMI, for $110 million.

158.     In December 2011, Jackson filed an involuntary petition for relief under chapter 7 against FLTCI.  FLTCI did not receive proper service of the petition, and an order for relief was entered by default in January 2012, commencing this case.

159.     The Trustee failed to notify the Polk County, Florida Circuit Court in the Jackson case that FLTCI was not properly served or to take any action whatsoever to seek relief from the improper addition of FLTCI to the judgment.

160.     In January 2012, the THI Receiver entered into a Settlement Agreement (the "Receiver Settlement") with all of the Plaintiffs (exclusive of FCC) and all of the other parties that were subjected to the Jackson proceedings supplementary by Wilkes.

161.     Pursuant to the Receiver Settlement, the THI Receiver delegated the duty to defend THMI against the Defendant Estates to FAS.  This delegation was never effectuated, and the Receiver retained control of THMI's defense in these actions until this Court ruled that Defendant Trustee has sole control of THMI's defense and such control was actually assumed by the Trustee.

162.     Pursuant to the Receiver Settlement, the THI Receiver, on behalf of THI and its subsidiaries, settled and released the Plaintiffs (excluding FCC) and the other signatories

> from any and all right, title and interest in and to any and all claims, causes of action and choses in action that they may have against each such [settling third party] as of the date of [the Receiver Settlement], including, but not limited to, claims for contribution, indemnification, fraudulent conveyance, any claim based on tort, any claim based on statute, or any claim based on contract…

163.    The Receiver Settlement was approved by the Circuit Court for Baltimore County, Maryland on January 26, 2012, after vigorous objections by counsel to the Defendant Estates, Wilkes, which objections were overruled.

164.    Just weeks earlier, the Circuit Court for Baltimore County previously denied approval of a settlement with Wilkes and the Defendant Estates.  Among other provisions, Wilkes' proposed settlement with the THI Receiver included the Defendant Estates' acquisition of all claims and causes of action of THI and THMI against the Plaintiffs and the other third party targets of the Jackson proceedings supplementary, including fraudulent transfer, alter ego and related claims, for the sum of $50,000.

165.    This Court has found that the Receiver Settlement did not transfer any right, title or interest in any assets, property, or causes of action of FLTCI or THMI.

166.    After the commencement of this chapter 7 case, the Defendant Estates continued to prosecute their claims against THI and THMI as original defendants, with full knowledge that THI and THMI could not have caused any harm to the Defendant Estates.

167.    Jackson, Nunziata and Webb have also pursued collection efforts against the Plaintiffs (excluding FCC) and certain other third party targets in proceedings supplementary.

168.    On July 22, 2013, Townsend obtained a jury verdict against THI in the amount of $1.1 billion.  Rather than commence proceedings supplementary against the Plaintiffs and others, Townsend simply made an *ex parte* request to the trial judge that he add these parties to this judgment.  The trial judge complied.

169.    The Trustee has never asserted that the Defendant Estates' actions against THMI, or that the Darson Estate's actions directly against FLTCI, violate the automatic stay or otherwise impact the administration of this chapter 7 estate.

170.    The Trustee has never tried to prevent the Defendant Estates or Wilkes from pursuing creditors' rights actions related to THMI for Lyric-operated facilities against the Plaintiffs or any other target of this chapter 7 estate, even though she has argued (with the support of the Defendant Estates) those actions are property of this chapter 7 estate.

171.    The Trustee has sought, successfully, to enjoin Plaintiffs FAS and FLTCH from pursuing declaratory judgment relief in the U.S. District Court for the Southern District of New York that they have no liability under creditors' rights actions related to THMI, on the basis that this action interfered with the administration of FLTCI's chapter 7 estate.

172.    Recognizing this inconsistency, on September 12, 2013, this Court ruled that the theories being pursued in proceedings supplementary by the Defendant Estates against the Plaintiffs and other third parties are identical to the theories being investigated, and that will likely ultimately be prosecuted, by the Trustee in this case.  As such, this Court ruled that these actions impact the administration of the chapter 7 estate and must be pursued in consolidated litigation in this Court, and that the Defendant Estates' efforts to litigate these theories in other courts must be enjoined.

173.    On or about October 1, 2013, Wilkes, acting on behalf of the Defendant Estates, filed an adversary proceeding in this Court against the Plaintiffs and several other third party "targets" of Wilkes and the Trustee.  This action did not join the Debtor, the Trustee, or THMI to the suit.  This action also did not address the pendency of the several Florida state court proceedings in which Wilkes is pursuing the exact same theories against the exact same parties under the exact same facts, which is the scenario this Court's Memorandum Opinion was entered to avoid.

## Causes of Action

### Count I

### Injunctive Relief Against Defendants Jackson, Nunziata, Webb, Jones, Sasser and Townsend

174.    Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

175.    This Court has ruled in its Memorandum Opinion that the continuation of state court proceedings supplementary and similar proceedings by the Defendant Estates through actions of Wilkes to collect judgments against both THMI and THI unnecessarily interferes with the administration of FLTCI's chapter 7 estate because the claims being pursued by them are virtually identical to the claims allegedly belonging to this estate.

176.    This Court has found that the continuation of such state court proceedings could lead to inconsistent results.

177.    As well, Plaintiffs and others will suffer imminent harm if these claims must be defended multiple times in separate courts.

178.    This Court has therefore ruled that it will require the Trustee, the Defendant Estates, the Plaintiffs, and the other targets of such state court proceedings to litigate the claims asserted in these proceedings in a single proceeding before this Court.

179.    As such, based on the rulings in the Memorandum Opinion and pursuant to section 105(a) of the Bankruptcy Code, Plaintiffs hereby respectfully request that the Court enter a judgment enjoining the Defendant Estates and their counsel from prosecuting or commencing any proceedings supplementary or similar actions to collect on judgments against THI or THMI against the Plaintiffs and granting such other relief as is just and proper under section 105(a).

### Count II

<u>Declaratory Relief Against All Defendants</u>
<u>(THI Creditors' Rights Action)</u>

180.    Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

181.    Upon the commencement of the THI receivership in January 2009, all causes of action for avoidance of transfers by THI or any of its affiliates, including causes of action for fraudulent transfers, vested exclusively in the court-appointed THI receiver under applicable law.

182.    Upon the commencement of the THI receivership, all causes of action against third parties for veil piercing, alter ego, and successor liability, and similar actions for derivative liability, for the debts or liabilities of THI and its vested exclusively in the court-appointed THI receiver under applicable law.

183.    Pursuant to the Receiver Settlement, all rights, claims and causes of action against Plaintiffs Forman, Grunstein, FLTCH, FAS and THIB, and all other settling parties to the Receiver Settlement, including actions for fraudulent transfer, veil piercing, alter ego, and successor liability, and similar actions for derivative liability, have been validly waived and released.

184.    Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that:

      a.      None of the Defendants have any right, title or interest in or to any actions for fraudulent transfer, veil piercing, alter ego, and successor liability, and similar actions for derivative liability, to recover any debts or liabilities of THI or its subsidiaries, including, without limitation, in any proceedings supplementary pursuant to Section 56.29 of Florida Statutes or similar post-judgment remedies;

      b.      None of the Defendants have any standing to pursue any such claims or causes of action against the Plaintiffs or any other party, whether by post-judgment proceedings supplementary or similar proceedings, direct actions or otherwise; and

      c.      None of the Plaintiffs have any liability, to the THI receivership estate or otherwise, on account of such claims and causes of action, as all such claims and causes of action have been validly released.

Count III

Declaratory Relief Against All Defendants<br>(Lack of Fraud by Plaintiffs)

185.    Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

186.    Up to and including the date of the closing of the sales of the stock of THMI and THIB on March 28, 2006, none of the Plaintiffs were aware or reasonably could have or should have been aware of (a) the existence or extent of any legitimate claims by the Defendant Estates against THMI or THI, or (b) any other specific unindemnified PLGL claims against THMI or THI.

187.    Upon its sale to FLTCI, THMI was the subject of at least 135 PLGL claims or pending lawsuits, only two of which were claims of the Defendant Estates.

188.    On information and belief, no party other than the Defendant Estates continues to assert any claim against THMI.

189.    The THMI SPA and the THIB SPA provided for the full defense and indemnity of THMI in actions related to services it provided for facilities indirectly owned by THI and THIB, which constituted all the facilities for which THMI was performing services at the time of the closing of the stock sales.

190.    FLTCH, as purchaser of the stock of THIB, was unaware that THMI had released Lyric of its indemnification obligations relating to services provided by THMI to Lyric facilities.

191.    None of the Plaintiffs or FLTCI intended to leave THMI with any undefended or unindemnified liabilities after the closing of the sale of the THMI stock to FLTCI.

192.     None of the Plaintiffs or FLTCI believed or reasonably should have believed that THMI was being left with any undefended or unindemnified liabilities after the closing of the stock sales.

193.     None of the Plaintiffs or FLTCI could have reasonably known that THMI would ever be found liable to any party, including the Defendant Estates, for amounts outside the ordinary range of liability for PLGL claims against management companies similar to THMI.

194.     At all relevant times, THMI's only material assets consisted of contracts to manage Lyric facilities, and fees it collected from its performance of THIBM's duties under its contracts with THIB facilities.

195.     At all relevant times, these assets generated negative EBITDA.

196.     THMI therefore had zero enterprise value.

197.     Thus, at all relevant times, THMI's assets and equity interests had negligible value, both to a willing buyer and to an executing judgment creditor.

198.     Thus, at no time was THMI divested of assets of material value that would have been available to satisfy any claims or judgments against THMI.

199.     Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that:

   a.     None of the Plaintiffs or FLTCI ever acted or omitted to act with any intent to deceive or defraud any of the Defendant Estates, THI or THMI in connection with the March 2006 stock sales;

   b.     None of the Plaintiffs or FLTCI intended to leave THI or THMI with the inability to satisfy their legitimate obligations if they came due;

   c.     None of the Defendant Estates, THI or THMI were materially harmed or prejudiced by the closing of the March 2006 stock sales; and

   d.     Therefore, none of the Plaintiffs have any liability to the Defendants for fraud or any other related or inchoate theory regarding actual or constructive fraud.

<u>Count IV</u>

<u>Declaratory Relief Against All Defendants</u>
<u>(No Avoidable Transfers from FLTCI)</u>

200.     Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully

written herein.

201.     None of the Plaintiffs ever received a transfer of any interest in property from

FLTCI.

202.     Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and

2202 and Fed. R. Civ. P. 57, that none of the Plaintiffs has any liability to the chapter 7 estate of

FLTCI for recovery of any theory of avoidable transfer under chapter 5 of the Bankruptcy Code,

including, without limitation, actual or fraudulent transfer or conveyance.

<u>Count V</u>

<u>Declaratory Relief Against All Defendants</u>
<u>(No Fraudulent Transfers from THMI)</u>

203.     Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully

written herein.

204.     Plaintiffs never received a transfer of any property from THMI.

205.     At all relevant times, THMI's only material assets or operations consisted of

contracts to manage Lyric facilities, and fees it collected from its performance of THIBM's

duties under its contracts with THIB facilities prior to March 2006.  These arrangements were at

all times terminable at will by the counter-parties.

206.     At all relevant times, these operations generated negative EBITDA.  THMI

therefore had zero enterprise value.

207.     Thus, at all relevant times, THMI had negligible value, both to a willing buyer

and to an executing judgment creditor.

208.    Thus, at no time was THMI divested of assets of material value that would have been available to satisfy any claims or judgments against THMI.

209.    Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that:

      a.     None of the Plaintiffs ever received a transfer of any interest in property of THMI with actual or constructive intent (by either Plaintiffs or THMI) to hinder, delay or defraud creditors;

      b.     Any property of THMI that may be deemed to have been transferred to any of the Plaintiffs at any time did not have any value that could have been subject to execution by the Defendant Estates; and

      c.     None of the Plaintiffs has any liability to THMI or its creditors for recovery under any theory of avoidable transfer, including, without limitation, actual or fraudulent transfer or conveyance under applicable law.

## Count VI

### Declaratory Relief Against All Defendants
### (No Fraudulent Transfers from THI)

210.    Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

211.    None of the Plaintiffs ever received a transfer of any interest in property from THI.

212.    Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that none of the Plaintiffs has any liability to THI, its receivership estate, or its creditors, for recovery of any theory of avoidable transfer, including, without limitation, actual or fraudulent transfer or conveyance under applicable law.

<u>Count VII</u>

<u>Declaratory Relief Against All Defendants</u>
<u>(Lack of Liability as "Alter Egos" of FLTCI)</u>

213.    Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

214.    None of the Plaintiffs was ever an insider or affiliate (each as defined in the Bankruptcy Code) of FLTCI.

215.    None of the Plaintiffs ever used FLTCI as their mere instrument to conduct any activity.

216.    None of the Plaintiffs ever exercised any control over FLTCI or purported to act as its representative.

217.    None of the Plaintiffs ever used FLTCI to commit any wrongdoing, including, without limitation, any fraud or conspiracy to defraud THMI or its creditors (including the Defendant Estates).

218.    FLTCI has not committed any actionable wrongdoing since its formation in December 2005.

219.    Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that none of the Plaintiffs are liable to FLTCI, its chapter 7 estate, or its creditors under any theory of vicarious liability, including alter ego, agency, instrumentality or veil piercing, under applicable law.

<u>Count VIII</u>

<u>Declaratory Relief Against All Defendants</u>
<u>(Lack of Liability as "Alter Egos" of THMI)</u>

220.    Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

221.     Plaintiffs FLTCH, Forman, Grunstein and FAS were never insiders or affiliates (each as defined in the Bankruptcy Code) of THMI.

222.     Although Plaintiffs THIB and FCC (f/k/a/ THBM) were under common indirect ownership with THMI by THIH until the closing of the March 2006 sale of THIB's stock to FLTCH, THIB and FCC never held any direct or indirect ownership stake in THMI.

223.     None of the Plaintiffs or FLTCI ever used THMI as their mere instrument.

224.     None of the Plaintiffs or FLTCI ever used THMI to commit any wrongdoing.

225.     None of the Plaintiffs, including THIB and FCC, or FLTCI ever exercised any financial, operational or other control over THMI or purported to act as its representative or agent prior to March 28, 2006 and/or the cessation of THMI's business operations.

226.     None of the Defendants were damaged by any conduct of the Plaintiffs from and after the March 28, 2006 stock sale closings, including any involvement by any of the Plaintiffs in the defense of THMI in any PLGL actions.

227.     FAS' involvement in the defense of THMI in various cases after the closing of the March 28, 2006 stock sales has no relevance to any claim that any of the Plaintiffs are alter egos of THMI because (a) none of the Defendants were damaged by FAS' role in THMI's defense, (b) none of the Defendants were damaged by the stock sales themselves, and (c) FAS did not otherwise use its role in THMI's defense to commit any wrongdoing.

228.     Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that none of the Plaintiffs or FLTCI are liable to THMI or its creditors under any theory of vicarious liability, including alter ego, agency, instrumentality, substantive consolidation, or veil piercing.

Count IX

Declaratory Relief Against All Defendants
(Lack of Liability as "Alter Egos" of THI)

229.     Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully

written herein.

230.     Plaintiffs FLTCH, Forman, Grunstein and FAS were never insiders or affiliates

(each as defined in the Bankruptcy Code) of THI.

231.     Although Plaintiffs THIB and FCC (f/k/a/ THBM) were under common indirect

ownership with THI by THIH until the closing of the March 2006 sale of THIB's stock to

FLTCH, THIB and FCC never held any direct or indirect ownership stake in THI.

232.     None of the Plaintiffs ever used THI as their mere instrument to conduct any

activity.

233.     None of the Plaintiffs ever used THI to commit any wrongdoing.

234.     None of the Plaintiffs ever exercised any control over THI, owned any stock in

THI or any company owning any stock in THI, or purported to act as representative or agent of

THI at any time through and including March 28, 2006.

235.     No actual or alleged wrongdoing by THMI or THI that purportedly caused harm

to the creditors of FLTCI, THMI or THI occurred after March 28, 2006.

236.     None of the Defendants were damaged by any conduct of the Plaintiffs from and

after the March 28, 2006 stock sale closings, including any involvement by any of the Plaintiffs

in the defense of THI in any PLGL actions.

237.     FAS' involvement in the defense of THI in various cases after the closing of the

March 28, 2006 stock sales has no relevance to any claim that any of the Plaintiffs are alter egos

of THI because (a) none of the Defendants were damaged by FAS' role in THI's defense, (b)

none of the Defendants were damaged by the stock sales themselves, and (c) FAS did not otherwise use its role in THI's defense to commit any wrongdoing.

238.     Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that none of the Plaintiffs are liable to THI, its receivership estate or its creditors under any theory of vicarious liability, including alter ego, agency, instrumentality, or veil piercing.

<u>Count X</u>

<u>Declaratory Relief Against All Defendants</u>
<u>(Lack of Liability as Successor of FLTCI)</u>

239.     Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

240.     None of the Plaintiffs were shareholders, officers or directors of FLTCI at any time either before or after the closing of the March 2006 stock sales.

241.     None of the Plaintiffs ever acquired any assets of FLTCI.

242.     Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that Plaintiffs have no liability under theories of mere continuation or de facto merger as successors of FLTCI.

<u>Count XI</u>

<u>Declaratory Relief Against All Defendants</u>
<u>(Lack of Liability as Successor of THMI)</u>

243.     Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

244.     None of the Plaintiffs were shareholders, officers or directors of THMI or any of its direct or indirect shareholders, including GTCR, at any time either before or after the closing of the March 2006 stock sales.

245.    None of the Plaintiffs held any fiduciary or confidential relationship with any shareholders, officers or directors of THMI or any of its direct or indirect shareholders, including GTCR, at any time either before or after the closing of the March 2006 stock sales.

246.    Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that Plaintiffs have no liability under theories of mere continuation or de facto merger as successors of THMI or its business.

Count XII

Declaratory Relief Against All Defendants
(Lack of Liability as Successor of THI)

247.    Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

248.    None of the Plaintiffs were shareholders, officers or directors of THI or any of its direct or indirect shareholders, including GTCR, at any time either before or after the closing of the March 2006 stock sales.

249.    None of the Plaintiffs held any fiduciary or confidential relationship with any shareholders, officers or directors of THI or any of its direct or indirect shareholders, including GTCR, at any time either before or after the closing of the March 2006 stock sales.

250.    Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202 and Fed. R. Civ. P. 57, that Plaintiffs have no liability under theories of mere continuation or de facto merger as successors of THI or its business.

Count XIII

Declaratory Relief Against All Defendants
(Statutes of Limitations)

251.    Plaintiffs hereby reallege and incorporate all preceding paragraphs as if fully written herein.

252.    The sale of the THMI stock to FLTCI and the sale of the THIB stock to FLTCH

closed on March 28, 2006.

253.    On information and belief, the Defendant Estates, through their counsel, learned

about these transactions on or before January 1, 2007 at the latest.

254.    Plaintiffs therefore seek a declaratory judgment pursuant to 28 U.S.C. 2201 and

2202 and Fed. R. Civ. P. 57, that:

   a.    Any and all applicable statutes of limitation for avoidance and recovery of any transfers by FLTCI, THI or THMI that occurred concurrently with or prior to the closing of the stock sales expired prior to the commencement of this chapter 7 case, and/or are now expired, and such actions are forever barred; and

   b.    Any and all applicable statutes of limitation for any claim or cause of action seeking to hold the Plaintiffs, or any of them, liable to FLTCI, THMI or their creditors under any theory of vicarious or derivative liability, including alter ego, veil piercing, de facto merger, mere continuation, or successor liability, based in any part of the March 2006 stock sales expired prior to the commencement of this chapter 7 case, and/or are now expired, and such actions are forever barred.

Dated:  October 8, 2013                              Respectfully submitted,


/s/ Lisa Markofsky                                   /s/ Gregory M. McCoskey
Lisa Markofsky                                       Gregory M. McCoskey
lmarkofsky@proskauer.com                             greg.mccoskey@akerman.com
Florida Bar No. 0016673                              Florida Bar No. 0089850
PROSKAUER ROSE LLP                                   AKERMAN SENTERFITT
2255 Glades Road, Suite 421                          SunTrust Financial Centre, Suite 1700
Atrium                                               401 E. Jackson Street
Boca Raton, FL  33431                                Tampa, FL 33602
Telephone:  (561) 241-7400                           Tel: (813) 223-7333
Facsimile:   (561) 241-7145                          Fax: (813) 223-2837


-and-                                                 and –

Paul V. Possinger                                    Michael I. Goldberg
*Admitted Pro Hac Vice*                              michael.goldberg@akerman.com
PROSKAUER ROSE LLP                                   Florida Bar No. 886602
70 W. Madison St.                                    AKERMAN SENTERFITT
Chicago, Illinois 60602-4342                         350 East Las Olas Boulevard, Suite 1600
Telephone:  (312) 962-3550                           Fort Lauderdale, Florida 33301
Facsimile:  (312) 962-3551                           (954) 468-2444 (voice)
                                                     (954) 463-2224 (facsimile)


*Attorneys for Plaintiffs Murray*                    *Attorneys for Plaintiffs Fundamental*
*Forman, Leonard Grunstein and*                      *Administrative Services, LLC,*
*Fundamental Long Term Care*                         *Fundamental Clinical Consulting, LLC,*
*Holding, LLC*                                       *and THI 0f Baltimore, Inc.*